## OCEAN S. S. CO. v. ÆTNA INS. CO.

(District Court, S. D. Georgia. E. D. March 18, 1903.)

1. MARINE INSURANCE—CONSTRUCTION OF POLICY—PROOF OF USAGE.

Parol evidence of usage is not admissible to affect the construction of a policy of marine insurance where the contract is expressed in terms which are clear and plain, unless it is shown that the words used have, by usage, acquired a special and peculiar meaning different from their ordinary meaning.

2. SAME—REINSURANCE.

Libelant, a marine carrier, was accustomed to issue to shippers "insured bills of lading," which bound it as an insurer of the cargo cov-

ered thereby, and against the risks so assumed it took out a marine policy with respondent, which contained the provision that "this insurance is hereby understood and agreed to be in effect a reinsurance of the risks which are or may at any time be assumed by the assured, and the assurers agree to pay the assured in full all claims for such losses arising from perils enumerated in the policy as the assured may, in their judgment, settle for with the owners or other parties interested in the merchandise." A loss of cargo occurred from fire, which was one of the perils insured against, and, the contribution to be made by the insured bills of lading cargo having been determined in general average, libelant paid the same. *Held*, that by the plain terms of the policy respondent was liable for the full amount so paid to the extent of the amount named in the policy, which was one of reinsurance, and not of co-insurance such as would entitle respondent to prorate the loss with libelant; and that it was immaterial that the loss was only partial, both as to the entire cargo and the insured bill of lading cargo.

In Admiralty. Action on policy of marine insurance.

Henry C. Cunningham and T. Mayhew Cunningham, for libelant.
Samuel B. Adams and A. Pratt Adams, for respondent.

SPEER, District Judge. The Ocean Steamship Company of Savannah has brought a libel in personam against the Ætna Insurance Company of Hartford, Conn. This is brought to enforce the apparent obligation of a policy of marine insurance. The contract covered all merchandise transported by the Ocean Steamship Company which that company or any of its transportation agencies or connections had insured or might insure. Among the casualties or misfortunes against which this policy provided indemnity were perils by fire, and while it was of force the cargo of the steamship City of Macon, operated and controlled by the Ocean Steamship Company, was damaged by fire, and an average loss incurred. It appears from the record that it was the policy of the Ocean Steamship Company, for the purpose of securing shipments, to issue "insured bills of lading" to its consignors of freight. That portion of the cargo of the steamer for which bills of lading of this character had been issued was of the value of $96,498.25, and this sustained a direct damage from the fire and its consequences in the sum of $58,323.26. In estimating the general average it was developed that the contribution which the "insured bills of lading cargo" must make was $31,224.26. This sum was paid by the Ocean Steamship Company pursuant to its obligation to insure this portion of the cargo, an express obligation, it must be observed, which was imprinted on each bill of lading of this character. From the contingency of this loss the Ocean Steamship Company had secured insurance from the respondent in the amount of $25,000, and, the latter refusing to pay this sum, the libel is brought to recover the amount prima facie appearing to be due. The respondent has paid $5,000 of this sum, and therefore the amount actually in dispute is $20,000.

The respondent resists the claim of libelant and makes the following contentions: The loss was not total, and the adjustment of average, therefore, necessarily implies proportionate contribution, and not an assessment upon one interest at the expense of another. For the libelant to insist, therefore, that the respondent must pay $25,000 on

account of the general average of $31,224.26, is, it is insisted, contrary to the principles of equity and maritime law. This, it is insisted, would oblige the defendant insurance company to pay a total loss, when actually there was a partial loss only of 25 per cent. of the cargo insured, and it is insisted that the libelant, by the payment of premiums on $25,000 merely, really obtained insurance to the extent of over $96,000. There is another urgent contention. A lengthy deposition of a Mr. Wallace, an official of the defendant company, who is an expert in such matters, is offered to show that the construction placed upon this policy by the respondent is in accordance with the usage and custom of underwriters generally. Objection is made to the competency of this evidence, it being insisted by libelant that the court is under obligation to construe the policy of insurance in accordance with its clear and unambiguous terms. This last contention, accordingly as it may be determined, seems controlling.

A great deal has been said in the argument with regard to the looseness and informality attending the construction of marine insurance policies, and the necessity of admitting testimony by parol to explain them. Much of this is traceable to a remark of Mr. Justice Buller made in 1791, in Brough v. Whitmore, 4 Term Reports, 206–210, viz., that such a policy "has at all times been considered in courts of law as an absurd, incoherent instrument, and it is founded on usage, and must be governed and construed by usage." This, it is insisted, is as true now as it was then. The respondent has not found it difficult to cite from the early volumes of the Supreme Court excerpts from opinions which seem to confirm this proposition. No less an authority than Chief Justice Marshall in Yeaton v. Fry, 5 Cranch, 345, 3 L. Ed. 117, observed:

"Policies of insurance are generally the most informal instruments which are brought into courts of justice, and there are no instruments which are more liberally construed in order to effect the real intention of the parties, if that intention can be clearly ascertained."

This deliverance of Chief Justice Marshall was made in 1809, or only 18 years after the animadversion of Mr. Justice Buller upon insurance policies. In the latter case our Supreme Court was dealing with a clause in a policy which insured for a certain specified sum the brig Richard "at and from Tobago to one or more ports in the West Indies, and at and from thence to Norfolk," against "all risks, blockaded ports and Hispaniola excepted." It will be conceded, we think, that the remark of the great chief justice was no aspersion upon the language of that policy. The same illustrious jurist made substantially the same utterance in the case of Maryland Insurance Company v. Woods, 6 Cranch, 45, 3 L. Ed. 143. The question there was whether in an action upon a policy on property warranted neutral, "proof of which to be required in the United States only," a sentence of condemnation in a foreign court of admiralty upon the grounds of breach of blockade is not conclusive evidence of a violation of the warranty. The ambiguity there is conspicuous. A much more recent decision by the same court is believed to contain a more accurate description of the modern policy of marine insurance. This is found in the case of General Mutual Insurance Company v. Sherwood, 14

How. 362, 14 L. Ed. 452. After referring to the observations of Justice Buller, as reported by Chief Justice Marshall, the court, through Mr. Justice Curtis, declares that such a contract, "notwithstanding the number and variety of the interests which it embraces, and of the events by which it is affected, has been reduced to much certainty by the long practice of acute and well-informed men in commercial countries, by the decisions of courts in America and in England, and by able writers on the subject in this and other countries." Surely, it cannot now with propriety be contended that the vast business of insurance conducted in the main by trained minds of the keenest intelligence and broadest experience, with the enormous values therein invested, is now carried on by contracts as informal, as ambiguous and incoherent, as those which received, and no doubt deserved, the reprobation of the courts from whose decisions we have quoted. Such expressions, if found at all, will be rare in modern cases construing contracts of insurance. The proof of custom and usage was obviously valuable to the court, and therefore competent testimony where the meaning of the policies was obscure, and when the law was unsettled. But with this, as with other topics, the law is a progressive science. We find an extensive discussion of this precise question in 1 Arnould on Marine Insurance (7th Ed.) par. 56. This edition of a valuable work originally written by Sir Joseph Arnould was published in 1901, and seems to have been carefully edited by Edward Louis De Hart and Ralph Iliff Simey, both of the Inner Temple, barristers at law. Referring to cases arising on sea policies which were indeterminate, ambiguous, or technical, the author observes:

"From the frequency, probably, of such cases as those just referred to in this branch of the law, a notion appears at one time to have prevailed (favoured unquestionably by certain reported expressions of the earlier judges) that sea policies were not amenable to the rules of construction generally applicable to all other mercantile contracts, but were to be interpreted so as to carry out the assumed intentions of the parties, even though repugnant to the terms in which their intentions purported to be expressed on the face of the instrument itself. This notion is now discarded as erroneous. Parol evidence, whether of usage or otherwise, can in no case be admitted to contradict or materially vary the plain and express terms of a sea policy."

A great many cases decided by judges of the highest rank and greatest renown are cited in this work in support of this conclusion. All agree that there is no room for the admission of parol evidence to construe a contract expressed in terms which are to be understood in their plain, ordinary, and popular sense. Where, however, by some known usage of trade, they have acquired a peculiar sense, distinct from the popular sense of the same words, or where the context evidently shows that they must be understood in some other special and peculiar sense, parol evidence of usage may be admitted. In this connection what seems a highly satisfactory statement of the rule is quoted from an opinion of Erle, C. J.:

"A contract of insurance is a commercial instrument, and is to be construed, like all others, so as to give effect to the intention of the parties, and that intention is to be gathered from the words of the instrument interpreted by the surrounding circumstances. If the words are clear, the proper effect is to be given to them; if the words are capable of more inter-

pretations than one, the judge, with the aid of the jury and of the surrounding circumstances, is to put the true construction upon the contract."

The rule is also stated in Angell on the Law of Insurance, par. 25:

"Although usage may be admissible to explain what is doubtful, it is not admissible to contradict what is plain. Thus, where a policy was made in the usual form upon a ship, her tackle, apparel, boats, etc., evidence of usage that the underwriters never pay for the loss of boats slung upon the quarter, outside of the ship, was held inadmissible."

There will be found, we think, no case, or expression by any text-writer of repute, which will justify the admission of oral testimony to explain or vary by proof of usage such determinate and precise language as that in the clause of this policy upon which the libelant relies. It reads as follows:

"This insurance is hereby understood and agreed to be in effect a reinsurance of the risks which are or may at any time be assumed by the assured, and the assurers agree to pay the assured in full all claims for such losses arising from perils enumerated in the policy as the assured may, in their judgment, settle for with the owners or other parties interested in the merchandise as aforesaid, subject only to the terms of average above set forth."

The exception refers to certain perishable classes of goods, which were not insured at all, and to other matters about which there is no dispute. It will be observed that the insurer by this explicit clause in the policy wholly relinquishes any right to interfere with proofs of loss, or with any other matter arising between the Ocean Steamship Company and its shippers. The latter company is given the broadest liberty to settle the original insurance in such manner as may seem best to it, and the respondent agrees to pay the loss thus settled "in full." This could never be true in a case of ordinary double insurance, where the insurers have a mutuality of interest, the right to resist recovery altogether, and after recovery to pro rata contribution.

There is no doubt that, if this policy is to be treated as original or primitive insurance of the cargo, it being in its nature a marine policy, the contention of respondents would be sustained. While apparently arbitrary, the rule is admirably stated in Hughes on Admiralty, par. 39, p. 83:

"The measure of recovery in case of partial loss is in one respect strikingly different from the measure of recovery in fire insurance. If a house is insured against fire for $5,000, and the value of the house is $10,000, and the loss is $5,000, the insured recovers the full value of his policy. Under similar circumstances in marine insurance he only recovers such a proportion of the loss as the insured portion bears to the total value, it being considered that as to that part of the value which is not insured he is his own insurer, and must contribute to the loss to that extent. In arriving at these proportions the actual value of the subject insured is taken, except where there is an insured value fixed in the policy, in which case the insured value is taken."

This case, however, is on a policy of reinsurance. There is an express stipulation by which the underwriters agree to recoup the Ocean Steamship Company for all their losses "in full" to the extent of $25,000. How is it possible to regard this as a pro rata liability? An engagement to pay in full cannot be satisfied by a payment pro rata. The words "in full" must be construed in their plain and ordinary

sense in connection with the stipulation in the first clause of the policy by which it is agreed to effect a reinsurance of the risks which are or may be at any time assumed by the assured.

What seems to the court the cardinal error into which respondent has fallen is that it treats reinsurance and co-insurance, or double insurance, as one and the same thing. Had the Ætna Insurance Company and the Ocean Steamship Company jointly insured this cargo in the first instance, or had the Ocean Steamship Company taken out other reinsurance in addition to that which it secured from the Ætna, then the doctrine of pro rata contribution for which the respondent contends would in either case seem fully applicable. But this was not done. We may presume that it was believed by the officers of the Ocean Steamship Company bad policy to incur a risk of total loss on their part in a sum so large which might result to their "insured bills of lading cargo" from the perils of the sea or from fire. To avoid this, the Ocean Steamship Company insured its risk, not for the full amount of that risk, but for $25,000. The respondent was paid its usual premiums for a policy in that amount. The loss occurred. It meant a subtraction from the resources of the Ocean Steamship Company of more than $31,000. How great the loss beyond this is a matter in which the Ætna is not concerned. It has been paid no premiums to insure the total value of the "insured bills of lading cargo." It has been paid for insuring the risk which the Ocean Steamship Company took, and for insuring that to the amount agreed upon, namely, $25,000. It requires a refinement of subtlety and casuistry not usually present in the practical administration of law in contested cases to exonerate the insurance company from a payment of more than $8,000 when it agreed to pay $25,000, and which will require the Ocean Steamship Company to lose $23,000, when it had taken the precaution to protect itself against a loss $2,000 more than that sum.

This conclusion will, we think, be established by reference to principles stated by the most eminent text-writers and by incontestable authority. Says Angell on the Law of Fire Insurance, par. 88:

"A reinsurance, we have seen, differs very essentially from a double insurance. The latter occurs when several policies are effected for the benefit of the same person, and upon the same subject-matter, whereas the former is entered into by the insurer for his own protection."

An interesting discussion of this vital distinction may be found in the first volume (7th Ed.) of Arnould on the Law of Marine Insurance, already referred to. In paragraph 322 we find this statement:

"After an insurance has been made, the underwriter may, by the law and practice of all countries, have the whole amount at risk (or, as in France, the whole minus the premium) reinsured to him by some other underwriter. The object of this is to enable him to indemnify himself against the consequences of his own act whenever he finds he has undertaken a risk on imprudent terms, or bound himself to a greater amount than he may be able to discharge."

After commenting upon the large extent to which policies of this nature are now used, this writer continues:

"The contract of reinsurance is totally distinct from and unconnected with the original insurance. The original assured has no kind of claim against the reinsurer, or against any moneys paid by the reinsurer to the reassured.

The reassured remains solely liable on the original insurance and alone has any claim against the reinsurer." Paragraph 324.

The same author defines double insurance. This he states—

"Takes place when the assured makes two or more insurances on the same subject, the same risk, and the same interest. It is therefore a totally different thing from a reinsurance, which, as we have seen, is effected by the underwriter to secure himself from having to pay a loss."

This doctrine is otherwise expressed in Angell on the Law of Fire Insurance, par. 83:

"We have seen that a person by becoming an insurer of property thereby acquires an insurable interest in it, so that he may protect himself against the consequences of the risk he has been induced to assume by an insurance against it, which is termed a reinsurance."

Said Mr. Justice Sandford in Hone et al., Receivers of the American Mutual Insurance Company, v. Mutual Safety Insurance Company, 1 Sandf. 137:

"For more than two centuries, the contract of reassurance has been well known, and its principles firmly established; and we have not met with a single treatise or decision which deviates from the uniform doctrine maintained on the point in question. * * * The contract of reassurance is described as a contract of indemnity to the party obtaining it, and in all the modern treatises such indemnity is explicitly declared to be the whole sum reinsured."

It is, however, insisted by the proctors for respondent that this is not a total loss; that the loss was partial, and for that reason there should be contribution between the libelant, who originally insured the whole bill of lading cargo, and the respondent, who reinsured that risk in the sum of $25,000. It is clear, however, that the loss the Ocean Steamship Company incurred on its risk was its share of the general average, which amounted to $31,000. Obviously, while this was but a partial loss as to the entire cargo, and a partial loss also as to the bill of lading cargo, it was more than a total loss on the wholly distinct policy of reinsurance.

It is further insisted by the proctors for respondent that, since this is a case of marine insurance, the loss is determinable by the rule quoted from Hughes on Admiralty, supra. But, although marine insurance, it is a case of reinsurance, and, says Angell on the Law of Fire Insurance, par. 83: "In this particular [that is, reinsurance] no difference exists between marine and fire insurance. In neither case is it a wager, and in both cases the first insurer becomes entitled to a complete indemnity." This proposition is fully sustained by the cases cited by proctors for libelant in the argument and on the brief. Hone v. Mutual Safety Insurance Co., 1 Sandf. 137, affirmed in 2 N. Y. 236; Insurance Company v. Insurance Company, 38 Ohio St. 11, 43 Am. Rep. 413. This was a case of marine insurance. Merry v. Prince, 2 Mass. 176. This was also a case of marine insurance, and the reinsurance was less than the original insurance. It was not questioned but that the first insurer might recover from the reinsurer the full amount of the loss. See, also, Blackstone v. Alemannia Fire Insurance Co., 56 N. Y. 105; Illinois Mutual Insurance Company v. Andes Insurance Company, 67 Ill. 362, 16 Am. Rep. 620.

It has been even held that the party reassured is entitled to recover

not only the entire loss sustained by him, but also costs and expenses which he reasonably and necessarily incurred to protect himself from that loss, and to entitle him to a recovery against the reinsurers. N. Y. St. Marine Insurance Co. v. Protection Insurance Company, 18 Fed. Cas. 160, 1 Story, 158. See, also, Hastie v. De Pyster, 3 Caines, 191; Herckenrath v. Amer. Mutual Insurance Co., 3 Barb. Ch. 63; 11 Am. & Eng. Ency. Law, p. 344; 1 Arnould on Marine Insurance (7th Ed.) § 324.

Then, since it appears that this was a fire loss, especially protected by the policy of reinsurance, and that the Ocean Steamship Company has been obliged to pay an amount of loss greater than that reinsured by the policy of the Ætna Insurance Company under review, the libelant is entitled to be fully indemnified to the amount stipulated in that policy, and a decree accordingly may be taken.